

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 4, 2020**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| WAGGONER CATTLE, LLC, et al. | § | Case No. 18-20126-RLJ-11 |
| | § | |
| Debtor. | § | Jointly Administered |
| | § | |
| | § | |
| ——————————————— | § | ——————————————— |
| | § | |
| LONE STAR STATE BANK OF WEST TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-02007 |
| | § | (Civil Action No. 2:19-cv-00098-Z) |
| RABO AGRIFINANCE, LLC, | § | |
| WAGGONER CATTLE, LLC, CLIFF | § | |
| HANGER CATTLE, LLC, CIRCLE W OF | § | |
| DIMMITT, INC., | § | |
| | § | |
| Defendants. | | |

## RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS

On October 16, 2019, the plaintiff, Lone Star State Bank of West Texas (Lone Star), filed its Second Amended Complaint. Defendant, Rabo AgriFinance LLC (Rabo), on October 16, 2019, filed its motion to dismiss causes one and three through nine of Lone Star's Second Amended Complaint. I hereby submit my recommended disposition of the motion to the District Court. (By my Report and Recommendation of June 26, 2019, on Rabo's motion asking the District Court to withdraw the reference, I recommended that the reference of this suit to the bankruptcy court be withdrawn upon my certification that it is ready for trial and that, pending such certification, I hear all pretrial matters and submit dispositive motions to the District Court with a recommended disposition.)

1. Lone Star filed its response and brief opposing Rabo's motion, and then, on December 19, 2019, filed a supplement to its response. Rabo filed a response to Lone Star's supplement.

2. As I set forth in my June 26, 2019, Report and Recommendation, all trial and hearing deadlines for this adversary proceeding are presently stayed pending the District Court's decision on the motion to withdraw reference, this adversary proceeding concerns non-core causes of action, Rabo has timely demanded a jury trial and is entitled to a jury trial on most if not all the causes of action, and Rabo does not consent to the bankruptcy court conducting a jury trial or otherwise issuing a final order.

3. Both Lone Star and Rabo are asking that, rather than my making a final determination on Rabo's motion here, I issue a recommended disposition to the District Court. This request is consistent with the recommendation I made on the motion to withdraw reference.

4. For the reasons stated below, I recommend that Rabo's motion to dismiss be denied on the Third (Conversion), Fourth (Fraud), Fifth (Money Had and Received and Constructive

Trust), Sixth (Conspiracy), Seventh (Wrongful Offset), and Eighth (Equitable Subordination)

causes.  For the Ninth cause, for attorney's fees, I recommend that Rabo's motion be granted to

the extent sought under § 37.009 of the Texas Civil Practice and Remedies Code and § 38.001 of

the Texas Business and Commerce Code; Lone Star's request for attorney's fees as a component

of damages is proper.  Rabo withdrew its motion as to Lone Star's First Cause, Construction of

Intercreditor Agreement and Determination of Lien Priority.  *See infra* 6(g).

    5.  This adversary proceeding has a long and complicated procedural history.  *See* Doc. Nos.

30, 101, 143.[1]

    6.  Bases for Recommendation

        (a)    <u>Background.</u>

        This adversary proceeding began with Lone Star filing its original complaint against

Rabo, Waggoner Cattle, LLC (Waggoner Cattle), Cliff Hanger Cattle, LLC (Cliff Hanger),

and Circle W of Dimmitt, Inc. (Circle W) on June 29, 2018.[2]  Waggoner Cattle, Cliff Hanger,

and Circle W, along with Bugtussle Cattle, LLC (Bugtussle) (collectively, the Waggoner

Entities), each filed chapter 11 bankruptcy on April 9, 2018, and have been jointly

administered under Case No. 18-20126.  Lone Star brought sixteen causes of action.

        Six of the original causes of action were dismissed because they concerned causes

owned by the bankruptcy estates and Lone Star had not obtained permission to pursue such

actions.  The debtors, Waggoner Cattle, Cliff Hanger, and Circle W—brought-in by the

original complaint as "involuntary plaintiffs"—have also been dismissed from the

proceeding.  Rabo filed its answer to Lone Star's complaint that also included three

---

[1] References to "Doc. No." refer to documents filed in the bankruptcy court file of Adversary No. 18-02007, unless otherwise indicated.

[2] An adversary proceeding commenced by a complaint filed under Part VII of the Federal Rules of Bankruptcy Procedure is the same as a civil action under the Federal Rules of Civil Procedure.  *See* Fed. R. Bankr. P. 7003.

counterclaims against Lone Star. Lone Star moved to dismiss Rabo's counterclaims, which the Court denied by its order dated September 26, 2019. Lone Star then moved for leave to file the Second Amended Complaint, which the Court approved on October 15, 2019. Lone Star then filed the Second Amended Complaint. No debtor entity is presently a party to this adversary proceeding. Lone Star and Rabo each hold large claims—Lone Star over $11.8 million and Rabo over $13 million—against some or all of the Waggoner Entities.

At the time the Waggoner Entities filed their bankruptcy cases, Quint Waggoner, principal of the Waggoner Entities, filed his own personal chapter 11 case. The Waggoner Entities and Quint Waggoner obtained confirmation of their joint chapter 11 plan on August 5, 2019.

    (b)    <u>The Second Amended Complaint.</u>

Lone Star's Second Amended Complaint alleges nine causes of action: (1) construction of the Intercreditor Agreement and determination of lien priority; (2) breach of the Intercreditor Agreement; (3) conversion; (4) fraud; (5) money had and received and constructive trust; (6) civil conspiracy and conspiracy to defraud; (7) wrongful offset; (8) equitable subordination; and (9) attorney's fees and costs. Rabo's motion seeks dismissal of all of Lone Star's claims, except breach of contract, arguing that the claims fail to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), and that the claims for fraud and civil conspiracy and for conspiracy to defraud fail to sufficiently plead the heightened standard required under Rule 9 of the Federal Rules of Civil Procedure.

    (c)    <u>Factual Summary.</u>

The fifty-plus page factual statement of Lone Star's Second Amended Complaint, distilled down, alleges the following:

- Lone Star is owed over $11.8 million from financing the Waggoner Entities from July of 2011 through March of 2016; it holds a first-in-time security interest in the debtors' assets, particularly the cattle inventory of Waggoner Cattle.

- For Quint Waggoner and his complicated cattle operation, Waggoner Cattle transferred cattle to Cliff Hanger; such cattle *and their proceeds* were subject of Lone Star's first lien.

- In 2014, Rabo entered the picture with the plan of ultimately replacing Lone Star as the Waggoner Entities' primary lender; this meant eventually "taking out" Lone Star and thus freeing-up the assets to secure Rabo's on-going financing. As part of this, Rabo agreed to finance Cliff Hanger's part of the cattle operation.

- To accommodate Rabo's take-out of Lone Star, Rabo and Lone Star, on November 26, 2014, entered into an Intercreditor Agreement, of which debtors Cliff Hanger and Waggoner Cattle are also signatories. Under the Intercreditor Agreement, Lone Star agreed, under specified conditions, to subordinate part of its prior lien position to Rabo.

- In particular, the Intercreditor Agreement provided that Cliff Hanger did not become owner of the transferred cattle (from Waggoner Cattle) and Lone Star's first lien on the cattle and their proceeds was *not* subordinated *until* (i) Waggoner Cattle was *paid in full* for the transferred cattle *and* (ii) the cattle had been moved to feed yards being used by Cliff Hanger. Once these two conditions were met, Cliff Hanger's rights in the cattle matured and Rabo's lien attached.

- Rabo and Cliff Hanger agreed that Rabo would advance a portion of the funds for Cliff Hanger's "purchase" of the cattle being transferred from Waggoner Cattle to

Cliff Hanger, and that "payment in full" to Waggoner Cattle for such transferred cattle consisted of an up-front transfer price of approximately 75% of the cattle's value and a later "distribution" from Cliff Hanger to Waggoner Cattle for the 25% balance of the cattle's value.  The distribution was to come from the equity realized by Cliff Hanger upon its ultimate sale of cattle.

- The Rabo advances to Cliff Hanger were ostensibly made on a required 25% equity margin in the cattle being transferred.

- The Intercreditor Agreement does not cover, and thus does not affect, Lone Star's first lien on cattle located "on pasture" or at the "calf ranch."

- In acceding to the cattle transfers from Waggoner Cattle, Lone Star relied on the borrowing base certificates provided to it by both Quint Waggoner and Paul Strouhal of Rabo.  The certificates reflected the aggregated information from which Lone Star could assess and predict Cliff Hanger's equity in the cattle and thus the ultimate source of payment for the transferred cattle.

- Within months, Rabo grew uncomfortable with its position—it was owed over $39 million—and decided that it needed to "syndicate" the loan, meaning it needed to sell-off part of the credit to a partner as a way to reduce its exposure.

- By September 2015, Rabo, given its intimate involvement with the Waggoner Entities, knew its credit was in trouble.  To encourage Lone Star's continued involvement and to lure potential "syndicate" partners, Rabo engaged in fraudulent conduct to make Cliff Hanger's operations and its loans look better than they actually were.  Rabo participated in issuing false borrowing base

certificates to Lone Star: the certificates reflected both costs lower than and weight-gains greater than actual to inflate the cattle's value.

- As a party to the Intercreditor Agreement, Rabo knew that the transfer of cattle from Waggoner Cattle to Cliff Hanger required payment in full.  It also knew how full payment was to be made—by the upfront 75% transfer payment, which was funded by its loans to Cliff Hanger, and by the subsequent "distribution" from the equity realized by Cliff Hanger on its re-sales of the cattle when they were ready.

- Rabo knew that Lone Star relied upon the borrowing base certificates to continue extending credit and consenting to Waggoner Cattle transferring the cattle to Cliff Hanger.  Positive borrowing base certificates assured Lone Star that Cliff Hanger would realize equity on its ultimate re-sales of the cattle and thus provide distribution funds to pay the remaining balance on the transferred cattle.

- In addition to falsifying borrowing base certificates, Rabo knew that Quint Waggoner moved funds and receivables around the various Waggoner Entities without properly designating or accounting for such transactions.

- Rabo knew that Quint Waggoner had calves sold "off pasture"—and thus not subject of the Intercreditor Agreement—to third parties, with the proceeds deposited with and ultimately "swept" and applied by Rabo.

- Lone Star was not paid in full for the transferred cattle and thus its liens were never subordinated under the Intercreditor Agreement.

(d)      The Motion to Dismiss—Rule 12(b)(6).

A motion to dismiss under Rule 12(b)(6)[3] for failure to state a claim upon which

relief can be granted tests the formal sufficiency of the plaintiff's statement of its claim for

relief.  A Rule 12(b)(6) motion is appropriate if the plaintiff has not provided fair notice of its

claim with factual allegations that, when accepted as true, are plausible and not merely

speculative.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555–56 (2007).  Motions to dismiss for failure to state a claim are generally viewed

with disfavor.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

"The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in

support of his claim that would entitle him to relief."  *Jones v. Greninger*, 188 F.3d 322, 324

(5th Cir. 1999) (per curiam).  The court liberally construes the complaint in the plaintiff's

favor, and all pleaded facts are taken as true.  *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d

440, 442 (5th Cir. 1986); *WHC Franchise Corp. v. Four JS Family, LLLP*, No. 3:05-0663,

2005 WL 8158394, at *1 (N.D. Tex. Nov. 30, 2005).  "The issue is not whether the plaintiff

will ultimately prevail, but whether he is entitled to offer evidence to support his claim."

*Jones*, 188 F.3d at 324.  "Thus, the court should not dismiss the claim unless the plaintiff

would not be entitled to relief under any set of facts or any possible theory that he could

prove consistent with the allegations in the complaint."  *Id.* (citing *Vander Zee v. Reno*, 73

F.3d 1365, 1368 (5th Cir. 1996)).  "This determination is context-specific and requires the

court to draw upon its own experience and common sense."  *Commonwealth Capital Corp. v.

Medshare Techs., Inc.*, No. 3:15-2144, 2015 WL 10818622, at *1 (N.D. Tex. Oct. 1, 2015).

---

[3] Reference to a Rule refers to the Federal Rules of Civil Procedure, unless otherwise indicated.

      (e)     <u>The Face of the Complaint.</u>

The premise of Lone Star's causes is that, given Rabo's alleged fraudulent conduct, Lone Star's first-in-time liens on Waggoner Cattle's cattle were never subordinated under the terms of the Intercreditor Agreement.  The Intercreditor Agreement is a significant intervening circumstance that, upon specific conditions, alters the relative lien priorities of the parties.

Lone Star holds the first lien and Rabo has, at best, a second lien.  Per the *allegations*, Rabo's conduct undermined Lone Star's interest in Waggoner Cattle's cattle.  Given the asserted causes of action, particularly those subject of Rabo's motion, and the complexity of the factual allegations, it is unclear whether *any* of Rabo's alleged misdeeds would constitute a breach of the Intercreditor Agreement and thus serve as a basis of recovery for Lone Star. Plus, the complaint alleges facts—that *no* payments were made for transferred cattle in some instances; that at other times cattle were sold "off pasture"—that, if true and given Lone Star's construction of the Intercreditor Agreement, may not implicate the Intercreditor Agreement.

The Intercreditor Agreement, attached as Exhibit A to the Second Amended Complaint, states that

> [a]ny Lone Star security interest in, or lien or encumbrance on, or claim to Cliff Hanger Collateral including proceeds thereof or rights relating thereto shall be junior in priority to the security interest in, lien, encumbrance on, claims or rights of [Rabo] to the Cliff Hanger Collateral. Upon delivery of the Collateral to the Cliff Hanger Feedyards and receipt of payment in full by Waggoner [Cattle], thereafter all Collateral located in the Cliff Hanger Feedyards shall be owned by and in possession of Cliff Hanger and shall be Cliff Hanger Collateral.

Doc. No. 159, Ex. A ¶ 2(a). It then provides that Rabo's lien against the "Waggoner Collateral" and their proceeds "*shall be*" junior to Lone Star's lien against the Waggoner Collateral. *Id*. ¶ 2(b) (emphasis added).

Lone Star's basic contention is that the two conditions—payment in full and delivery to the feed yards—did not occur and thus Cliff Hanger never obtained rights in the collateral. The subordination, Lone Star pleads, was never triggered.

The Intercreditor Agreement can be read to impose no affirmative obligation on either party, apart from the basic obligation to honor its effect. Rabo denies that it breached the Intercreditor Agreement. But, assuming the pleaded facts are true, liability and damages may result from conduct by Rabo that does not constitute a breach of the Intercreditor Agreement.

This basic construction of the Second Amended Complaint impacts Rabo's contention that certain of Lone Star's causes must be dismissed per the economic loss rule.

(f)     Economic Loss Rule Challenge.

Rabo's motion is largely based on Texas's economic loss rule. Rabo argues that Lone Star's conversion, fraud, civil conspiracy and conspiracy to defraud, and wrongful offset claims are all barred by the economic loss rule; such causes, it submits, are really breach of contract claims. But determining the application and effect of the economic loss rule is difficult, if not impossible, on a Rule 12(b)(6) motion where interpretation of a contract is required. This legal theory requires an intensive, fact-specific inquiry to assess its applicability. As one Texas court observed:

> Although areas of uncertainty exist under case law addressing the economic loss rule in Texas, at least one thing is clear: Details matter. It matters who contracted with whom to do what. It matters what the contracts say; what they cover; and what they do not cover. It matters what kind of damages are requested. It matters whether the requested damages are attributed to activities covered by the contracts. It matters whether and how multiple parties in a chain of contracts

> allocated among themselves the risk that participants in the chain would perform
> deficiently, along with the obligation to pay for deficient performance. It matters
> what kinds of claims are asserted and against whom they are asserted.

*Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 834 (Tex. App.—Houston [14th Dist.]

2012, pet. denied) (examining this legal theory in the context of a no-evidence summary

judgment motion).

    The economic loss rule generally precludes recovery where the harm is economic loss

of a contractual expectancy. *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445

S.W.3d 716, 718 (Tex. 2014). As such, "[t]he doctrine applies unless the 'duty allegedly

breached is independent of the contractual undertaking and the harm suffered is not merely

the economic loss of a contractual benefit.'" *Dick v. Colo. Hous. Enters., L.L.C.*, 780 Fed.

App'x 121, 125–26 (5th Cir. 2019) (quoting *Chapman Custom Homes*, 445 S.W.3d at 718)

(applying Texas law). "In determining whether a tort claim is merely a repackaged breach of

contract claim, a court must consider: 1) whether the claim is for breach of duty created by

contract, as opposed to a duty imposed by law; and 2) whether the injury is only the

economic loss to the subject of the contract itself." *Stanley Indus. of S. Fla. v. J.C. Penney

Co.*, No. 3:05-2499, 2006 WL 2432309, at *5 (N.D. Tex. Aug. 18, 2006).

    A party may plead alternative theories of recovery for the same harm, and a motion to

dismiss one theory because another theory is pleaded is not appropriate. *See, e.g.*, Fed. R.

Civ. P. 8(a), (e)(2); *Infowise Sols., Inc. v. Microstrategy Inc.*, No. 3:04-0553, 2004 WL

2870637, at *1 (N.D. Tex. Dec. 10, 2004) (denying motion to dismiss unjust enrichment

claim where plaintiff also pleaded the existence of a contract); *Nature's Formula, Inc. v.

Norstar Consumer Prods. Co.*, No. 3:03-1222, 2003 WL 23282765, at *3 (N.D. Tex. Sept.

10, 2003) (permitting plaintiff to alternatively plead unjust enrichment, promissory estoppel

and breach of contract theories). This court, the Northern District of Texas, has explicitly

found that while the economic loss rule may prohibit "recovery for a contract and tort claim"

where there is a valid contract governing the dispute, "it does not prevent a plaintiff from

*pleading* contract and tort claims as alternative theories of recovery." *Commonwealth*

*Capital Corp.*, 2015 WL 10818622, at *2 (citing Fed. R. Civ. P. 8(d)(2)–(3)) (emphasis in

original). This is especially true where there is a dispute about the validity of a contract or

the applicability of an agreement to certain claims and actions. *See Johnson v. Wells Fargo*

*Bank, NA*, 999 F. Supp. 2d 919, 929 (N.D. Tex. 2014) ("A party can plead legal and

equitable claims in the alternative . . . when one party disputes the existence of a contract

governing the dispute."). Lone Star has pleaded alternative theories of recovery, and whether

the economic loss rule bars certain claims may be determined only after the Intercreditor

Agreement has been interpreted and the rights of the parties under the agreement have been

established.

Rabo's argument that the economic loss rule bars most of Lone Star's claims as

disguised contract claims is premature at a Rule 12(b)(6)-motion-to-dismiss stage: the parties

dispute the agreement, and a plaintiff is permitted to plead alternative theories of recovery.

The economic loss rule, standing alone, does not, at this stage, require dismissal of Lone

Star's claims.

(g)  Lone Star's First Cause: Construction of Intercreditor Agreement and
Determination of Lien Priority

Rabo's Reply Brief, Doc No. 145, states that it agrees to withdraw its motion as to the

First Cause of Action for "'Construction of Intercreditor Agreement and Declaration of Lien

Priority,' because that claim is really just a part of [Lone Star's] contractual claims." Doc.

No. 145 at 3 n.2. Though the parties' counsel argued the point at the hearing as if it were still

a live issue, I am satisfied that the allegations, while likely improper as an action for

declaratory relief in federal court under the statutory provisions referenced—Tex. Civ. Prac.

& Rem. Code § 37.001 et seq. and under 28 U.S.C. § 2201[4]—are properly considered as

merely supportive of Lone Star's other causes of action and that Rabo's motion as to the first

cause is withdrawn.

(h) Lone Star's Third Cause: Conversion

In support of dismissal of Lone Star's conversion cause of action, Rabo relies on case

authority that, for the most part, addresses conversion of personal property *owned* by the

plaintiff. Lone Star never owned the cattle and thus there is no property that could have been

converted: "Plaintiff cannot establish the first element [of conversion] because Lone Star . . .

---

[4]The Fifth Circuit has consistently interpreted the Texas Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code, as a procedural statute inapplicable to declaratory judgment actions in federal court. *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 775 (N.D. Tex. 2017). As such, federal courts apply federal procedural rules, and this claim may only be considered under 28 U.S.C. § 2201. *Rhodes v. Prince*, No. 3:05-2343, 2006 WL 954023, at *4 (N.D. Tex. Apr. 11, 2006), *aff'd sub nom. Rhodes v. City of Arlington*, 215 Fed. App'x 329 (5th Cir. 2007).

Like the Texas Declaratory Judgments Act, a declaratory judgment under federal law does not create any substantive rights or causes of action but is a procedural device. *Carter v. Bank of Am., N.A.*, No. 3:12-4550, 2013 WL 1482610, at *3 (N.D. Tex. Apr. 9, 2013); *Castle Mortg. Corp. v. GMAC Mortg., LLC*, No. 3:12-1969, 2013 WL 5299298, at *4 (N.D. Tex. Sept. 20, 2013). It allows a party to obtain "an early adjudication of an actual controversy" arising under other substantive law, *Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 170 (5th Cir. 1990), and is intended to provide a means of settling an actual controversy before it ripens into a civil law violation or a breach of contract, *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). *See also Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 206–07 (Bankr. W.D. Tex. 2015). Federal courts generally have broad discretion to grant or refuse declaratory judgment claims. *See, e.g., Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991); *Metcalf v. Deutsche Bank Nat'l Tr. Co.*, No. 3:11-3014, 2012 WL 2399369, at *9 (N.D. Tex. June 26, 2012).

In the context of Rule 12(b)(6), courts regularly reject declaratory judgment claims that seek resolution of matters that will be resolved as part of the other claims in the lawsuit. *See, e.g., Flanagan v. Chesapeake Expl., LLC*, No. 3:15-0222, 2015 WL 6736648, at *4 (N.D. Tex. Nov. 4, 2015) (dismissing a declaratory judgment claim under 12(b)(6) because it was an issue that had to be determined to resolve plaintiff's breach of contract claim and therefore was duplicative); *Regus Mgmt. Grp., LLC v. Int'l Bus. Mach. Corp.*, No. 3:07-1799, 2008 WL 2434245, at *3 (N.D. Tex. June 17, 2008) (dismissing declaratory judgment claim as entirely repetitive and unnecessary); *Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-0160, 2007 WL 1791252, at *3 (N.D. Tex. June 21, 2007) (dismissing declaratory judgment action under Rule 12(b)(6) where it duplicated an existing breach of contract claim); *Assistmed, Inc. v. Conceptual Health Sols., Inc.*, No. 3:05-0880, 2006 WL 3691003, at *17 (N.D. Tex. Dec. 14, 2006) (same); *Albritton Props. v. Am. Empire Surplus Lines*, No. 3:04-2531, 2005 WL 975423, at *2 (N.D. Tex. Apr. 25, 2005) (dismissing declaratory judgment counterclaim under Rule 12(b)(6) where the disputed issues were already pending before the court); *Kougl v. Xspedius Mgmt. Co.*, No. 3:04-2518, 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005) (dismissing declaratory actions seeking contract interpretation where this would be resolved as part of breach of contract action).

neither owned nor had possession of the calves." Doc. No. 162 at 11–12. Plus, per Rabo, the calves were transferred to Cliff Hanger, not Rabo, and Rabo never exercised control over the cattle. Rabo further argues that Lone Star's conversion claim fails as a matter of law because Rabo's alleged conversion of the cattle proceeds concerns "money" and "[m]oney can be the object of conversion *only* when it can be described as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally." *Id*. at 12–13. And an action for conversion of money, in Texas, lies only where the money is (1) delivered for safekeeping, (2) intended to be segregated, (3) substantially in the form in which it was received, and (4) not the subject of a title claim by the keeper. *Id*. at 13. Lone Star fails each element, according to Rabo. Rabo, in effect, contends that it is impossible for Lone Star to have a conversion claim for cattle proceeds because Lone Star never owned the cattle and never entrusted the cattle proceeds with Rabo.

But Rabo mischaracterizes Lone Star's conversion claim. Lone Star's allegation of conversion concerns Waggoner Cattle's cattle *and their proceeds*, both of which secured the Waggoner Entities' debt to Lone Star. "A secured party may bring an action in conversion against a third party in order to vindicate rights in collateral." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 651 (5th Cir. 1991) (holding that a debtor's creditor was liable for conversion when the creditor acquired gas from the debtor and attempted to offset its credit against the purchase price of the gas because it violated another secured creditor's continuing rights in the collateral). "A properly perfected security interest extends to the identifiable cash proceeds of a sale of collateral subject to that security interest. The holder of the security interest is entitled to recover cash proceeds from unauthorized subsequent transferees." *ITT Commercial Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 305 (5th Cir.

1999) (citations omitted) (concluding that a district court improperly granted summary judgment for conversion of proceeds in favor of a superior-lien secured creditor against a junior secured creditor because the court had applied an improper legal standard as to whether the junior secured creditor accepted payment within the "ordinary course" and without knowledge of or recklessness about whether the payment violated a third party's security interest and remanded the case).

While the *ITT Commercial* case suggests knowledge of or reckless disregard for a superior lien is sufficient to hold the receiving person liable for conversion, Texas has since amended its commercial code. Now, under Texas law, a party must show "collusion with the debtor in violating the rights of the secured party." Tex. Bus. & Com. Code § 9.332; *see also* Tex. Bus. & Com. Code § 9.315 cmt. 7 ("In many cases, however, a purchaser or other transferee of the cash proceeds will take free of the perfected security interest. See, e.g., Sections 9-330(d) (purchaser of check), 9-331 (holder in due course of check), 9-332 (transferee of money or funds from a deposit account)."). Following this amendment, the actionability of a secured creditor's conversion claim for cash proceeds against another creditor has been recognized in a recent bankruptcy court in the Western District of Texas. *Deutsche Bank Tr. Co. Ams. v. First River Energy, LLC (In re First River Energy, LLC)*, No. 18-05015, 2019 WL 1103294, at *26 (Bankr. W.D. Tex. Mar. 7, 2019) (allowing a creditor with a superior security interest in cash proceeds to replead a conversion claim against another creditor that received cash proceeds from the sale of oil because it was an actionable claim). Additionally, a court in this division has recognized a plaintiff's claim for conversion of cash proceeds from the sale of cattle against another creditor that accepted the cash proceeds when the plaintiff had a superior perfected security interest in the cattle and the

proceeds of the cattle. *PlainsCapital Bank v. Kite Bros., LLC*, No. 5:06-200, 2007 WL 9718484, at *4–5 (N.D. Tex. Aug. 27, 2007).

I recommend that the Court deny Rabo's motion to dismiss Lone Star's conversion cause of action.

(i)    Lone Star's Fourth Cause: Fraud.

Lone Star alleges in count four a claim for fraud, contending that Rabo committed fraud by producing fraudulent borrowing base certificates and making fraudulent promises surrounding the "Take-Out" loan. Rabo moves to dismiss this claim, arguing that, if the nature of the injury suffered is contractual, the only recovery available is for breach of contract, and thus the fraud claim is barred by the economic loss rule. Rabo also argues that Lone Star has not met the pleading requirements for fraud under Rule 9.

The premise of this suit, as discussed at (e) above, will likely require, given proved facts, the interpretation and construction of the applicable contract, the Intercreditor Agreement. Whether the effect of the Intercreditor Agreement precludes a tort claim is premature on a motion to dismiss.

Rule 9(b) requires that a complaint alleging fraud must specify the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [the person] obtained thereby." *Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). The purpose of Rule 9(b) is not "to procure punctilious pleading detail." *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990). "The amount of particularity required to sufficiently plead fraud differs based upon the context of each case." *Sw. Agri-Plastics, Inc. v. Hog Slat, Inc.*, No. 3:09-1271, 2010 WL 711811, at *2 (N.D. Tex. Feb. 26, 2010). Generally, though, Rule 9(b) requires a

specification as to which statements were fraudulent, the identity of the speaker, when and why the statements were made, and an explanation as to why the statements were fraudulent. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).

Lone Star has met the heightened pleading requirements of Rule 9(b) for fraud. The Second Amended Complaint alleges specific fraudulent statements within specific documents, names specific Rabo employees who it says created or penned the fraudulent statements on specific dates, explains why the statements were fraudulent and why it matters. For example, Lone Star alleges that Rabo employee Paul Strouhal, on November 7–8, 2016, altered a borrowing base certificate to reflect a knowingly inaccurate cost of grain. And this was done to cause Lone Star to continue issuing credit (or perhaps avoid a default on its loans) to Waggoner Cattle. Lone Star has provided approximate dates and participants in the alleged fraud, along with the dates the alleged fraudulent borrowing base reports were written. *See Nature's Formula*, 2003 WL 23282765, at *4 (denying motion to dismiss fraudulent inducement claim where complaint alleged dates and participants in the alleged misrepresentations along with the dates of documents sent by defendant alleged to induce plaintiff).

Lone Star has satisfied the heightened pleading requirements of Rule 9(b). Rabo's motion to dismiss Lone Star's fraud claim should be denied.

(j)    Lone Star's Fifth Cause: Money Had and Received and Constructive Trust.

Rabo argues that both Lone Star's money-had-and-received and constructive trust causes must be dismissed because the parties' dispute is controlled by an express contract, the Intercreditor Agreement. As set forth above, at (e), it is improper, at this stage, to

determine the effect of the Intercreditor Agreement and whether it was breached. And Lone Star may plead alternative theories without subjecting one to dismissal under Rule 12(b)(6) simply because it is inconsistent with another theory of recovery. I recommend denial of Rabo's motion as to the money-had-and-received and constructive trust causes.

    (k)    <u>Lone Star's Sixth Cause: Civil Conspiracy and Conspiracy to Defraud.</u>

Rabo argues that Lone Star's civil conspiracy and conspiracy-to-defraud cause should be dismissed because it is barred by the economic loss rule, the elements of the claim are not properly pleaded, and the complaint does not meet the heightened Rule 9 pleading standard. Lone Star asserts that the conspiracy claim is not barred by the economic loss rule because it has sufficiently alleged the underlying torts of fraud and conversion and it has met the Rule 9 pleading standards.

Lone Star's conspiracy claim is not barred by the economic loss rule at this time because its conversion and fraud claims that relate to the conspiracy claim also survive this motion. *See Bates Energy Oil & Gas*, 361 F. Supp. 3d at 655 (holding that "the motion to dismiss based on the economic loss rule fails as to the fraudulent-inducement and fraud claims and [thus] related conspiracy claims"). (This assumes adoption of my recommendation on such claims.)

The pleading standards of Rule 9 apply to a state law claim of conspiracy to commit fraud. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009). To state a claim for civil conspiracy under Texas law, the pleading must sufficiently allege "(1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective; (4) one or more unlawful, overt acts; and (5) proximate damages." *Duzich v. Advantage Fin. Corp.*, 395 F.3d 527, 530 (5th Cir. 2004). "Civil conspiracy is a derivative

tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort."
*Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013). Whether a civil
conspiracy claim has been adequately pleaded depends upon the adequate pleading of the
underlying tort. *Id.* In addition to the underlying tort, a plaintiff must also allege, with
particularity, facts that make plausible its contention that there existed a common purpose or
object among defendant and others to defraud the plaintiff. *Newby v. Enron Corp. (In re
Enron Corp.)*, 762 F. Supp. 2d 942, 1022 (S.D. Tex. 2010). Since conspiracy is generally
proven through circumstantial evidence, the pleading needs only to "allege[] facts and
circumstances implying a meeting of the minds in a conspiracy." *Newby v. Enron Corp. (In
re Enron Corp.)*, 540 F. Supp. 2d 759, 774, 799 (S.D. Tex. 2007).

Lone Star has alleged all the elements of a civil conspiracy. The Second Amended
Complaint alleges that the debtors, the debtors' accountants, Paul Strouhal (Rabo employee),
and other employees of Rabo "agreed to engage in, and actually did engage in, an actual civil
conspiracy . . . to convert Lone Star's loan funds and collateral, and to fraudulently transfer
the collateral of Lone Star and those proceeds to Rabo, and to create falsified financial
information." Doc. No. 159 at 75. Further, Lone Star alleges that Rabo engaged in the
conspiracy "to induce Lone Star to take no action to preserve its collateral" so that Rabo
could convert Lone Star's collateral and create false financial information so the debt could
"be sold into a syndication [to decrease] Rabo's inevitable loss" on its loan to the Waggoner
Entities. *Id.* Lone Star has alleged several elements of conspiracy: two or more persons, a
meeting of the minds, and an objective to be accomplished. Lone Star has also alleged that
Rabo directed the Waggoner Entities to falsify their borrowing bases, an overt act, where
"Rabo agreed, directed and participated in the creation and distribution of these false

borrowing bases" which followed by several reasons why. *Id.* at 79. Lone Star states that Rabo collected proceeds that belong to Lone Star, another overt act. Lastly, Lone Star alleges injury, that the "conduct of Rabo and its conspirators . . . caused and produced actual damages to Lone Star." *Id.* at 76.

Lone Star has alleged the elements needed to raise a claim for civil conspiracy and conspiracy to defraud against Rabo. It has alleged facts sufficient to state a claim for fraud and conversion against Rabo. Similarly, Lone Star has also alleged facts sufficient to claim that Rabo conspired with the Waggoner Entities to defraud Lone Star. Rabo's motion to dismiss Lone Star's civil conspiracy and conspiracy-to-defraud claim should be denied.

(l)    Lone Star's Seventh Cause: Wrongful Offset.

Rabo argues that Lone Star's wrongful offset claim should be dismissed because (i) Lone Star did not allege that Rabo made an offset, (ii) the offset claim is really a conversion claim, and (iii) the claim is barred by the economic loss rule. Lone Star argues that it has sufficiently pleaded wrongful offset because Rabo is vicariously liable for the offset by the debtors through its involvement in conspiracy with the debtors and partaking in the conversion of Lone Star's collateral.[5]

"Wrongful offset is a subspecies of conversion, which is defined as an unauthorized exercise of the right of ownership over property belonging to another." *S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley*, 614 F.2d 1056, 1061 (5th Cir. 1980). And a third party "who is instrumental in the disposition of the property in denial of the mortgagee's

---

[5] I question if Lone Star and Rabo really mean joint and several liability rather than vicarious liability. *LandAmerica Commonwealth Title Co. v. Wido*, No. 5-14-00036, 2015 WL 6545685, at *11 (Tex. App.—Dallas Oct. 29, 2015, no pet.) ("A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy.").

right, or who causes or induces such disposition of the property, may be held by the mortgagee for conversion." *Oats v. Dublin Nat'l Bank*, 90 S.W.2d 824, 827 (Tex. 1936).

By the Second Amended Complaint, Lone Star alleges that one of the debtor entities, Cliff Hanger, fraudulently offset an account that was due to another debtor entity, Waggoner Cattle, for calves that were Lone Star's collateral. Lone Star alleges that both debtor entities inaccurately labeled a debt that was due to Waggoner Cattle as a loan, and rather than pay the full amount for the calves transferred between the debtor entities, Cliff Hanger wrongfully offset this "loan" amount against what it owed to Waggoner Cattle. Lone Star alleges Rabo's involvement in this offset is that Rabo collected the money in Cliff Hanger's account each day and "Cliff Hanger and Rabo converted" receivables from Cliff Hanger, Waggoner Cattle calves and proceeds of the calves, which are Lone Star collateral. Doc. 159 at 77.[6] The complaint then alleges that this wrongful offset by Cliff Hanger "was part of the conversion of Lone Star's collateral, and part of Rabo's breach of the Intercreditor Agreement." *Id.* at 78.

Lone Star has sufficiently and plausibly pleaded the wrongful offset claim by alleging that the Waggoner Entities' wrongful offset contributed to the alleged conversion and their conspiracy to convert. Wrongful offset is a type of conversion, and the Texas Supreme Court has held that the conversion acts of a debtor may be recoverable from a party that participated in or encouraged the conversion. *Oats*, 90 S.W.2d at 827. Lone Star has alleged that Rabo assisted or encouraged the Waggoner Entities to convert Lone Star's collateral and

---

[6] Lone Star alleges "Cliff Hanger and Rabo converted (1) $3,004,041.21 of Waggoner Cattle's receivable from Cliff Hanger, (2) $3,004,041.21 of underpriced Waggoner Cattle calves, and (3) $3,004,041.21 of proceeds of those Waggoner Cattle calves … which was Lone Star's collateral." *Id*. at 77–78. Lone Star is not alleging that Cliff Hanger and Rabo converted by the offset over $9 million but rather that it was a combination of these three things or one of these three things that resulted in the ultimate conversion of $3,004,041.21.

that the wrongful offset was a part of this conversion. Rabo's motion to dismiss Lone Star's wrongful offset claim should be denied.

(m) <u>Lone Star's Eighth Cause: Equitable Subordination.</u>

Rabo argues that Lone Star's equitable subordination claim should be dismissed as, again, not ripe for adjudication and also as barred by res judicata from confirmation of the underlying chapter 11 plan. Lone Star contends that it has alleged an injury that makes its claim ripe and that the claim is not barred by res judicata because it is not inconsistent with the chapter 11 plan and the plan does not address its claim or require dismissal of pending claims.

Equitable subordination is a remedial measure found in the Bankruptcy Code that enables a court to, in pertinent part, "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c).

I recommend denial of Rabo's motion seeking dismissal based on the res judicata effect of the Waggoner Entities' confirmed chapter 11 plan. First, it is difficult to conceive of how res judicata from a debtor's confirmed plan may apply to an action between two creditors of such debtor. Second, even if it does apply, it is improper, on a motion to dismiss, to consider Rabo's res judicata defense.[7] Such consideration would require evidence of the plan and its effect; the confirmed plan is not here before the Court. And there has been no evidence interpreting the plan. This may properly be considered on summary judgment.

---

[7] The general rule is that "res judicata . . . cannot be brought in a motion to dismiss" because it "must be pleaded as an affirmative defense," *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005), and "an affirmative defense [] should not be raised as part of a 12(b)(6) motion, but should instead be addressed at summary judgment or at trial." *Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. App'x 662, 664 n.1 (5th Cir. 2004) (citing *Moch v. E. Baton Rouge Par. Sch. Bd.*, 548 F.2d 594, 596 n.3 (5th Cir. 1977) ("Generally, a party cannot base a 12(b)(6) motion on res judicata.")).

Both Rabo's motion and Lone Star's response are based on the effect of the Waggoner Entities' confirmed chapter 11 plan. Rabo submits that the plan and its treatment of creditors foreclose the equitable subordination claim. Lone Star submits that the confirmed plan proves a "particularized injury," sufficient to satisfy standing. These arguments, however, are outside the scope of a motion to dismiss. I cannot discern how Lone Star would have a right, absent explicit authority, to bring an equitable subordination claim that seeks to subordinate Rabo's claim to the claims of all other creditors of the debtor entities. Nor can I conceive how, in light of a confirmed plan and its treatment of creditors, Rabo's claim could be subordinated to just Lone Star's claim. But these issues require evidence and are beyond the scope of a motion to dismiss. I recommend denial of Rabo's request to dismiss Lone Star's equitable subordination claim.

     (n)    <u>Lone Star's Ninth Cause: Attorney's Fees and Costs.</u>

Rabo argues that Lone Star's claim for attorney's fees and costs should be dismissed because, absent an enforceable contract or statute, a party must pay its own attorney's fees and Lone Star has not cited an applicable statute that allows recovery of fees and costs. Lone Star argues that its request for fees is not a "true claim" but rather a potential basis for relief as punitive damages. Despite this, Lone Star cites Tex. Civ. Prac. & Rem. Code § 37.009 and Tex. Bus. & Com. Code § 38.001 et seq. as a basis for the court to award attorney's fees and costs.

"As a general rule, attorney's fees are not recoverable in Texas unless provided for by contract or by statute." *Jeanbaptiste v. Wells Fargo Bank, N.A.*, No. 3:14-264, 2014 WL 2158415, at *12 (N.D. Tex. May 22, 2014), *aff'd*, 2014 WL 7723129 (5th Cir. Nov. 7, 2014) (granting a Rule 12(b)(6) motion to dismiss plaintiff's request for attorney's fees). There is

no dispute that the parties do not have an agreement that addresses attorney's fees.

Therefore, in order for Lone Star to be able to bring a claim for attorney's fees, such remedy

must be provided for by statute.

At the hearing, Lone Star conceded that it could not pursue attorney's fees under Tex.

Bus. & Com. Code § 38.001 et seq. because that provision applies to only individuals and

corporations; Rabo is a limited liability company.

Lone Star may not pursue attorney's fees under Tex. Civ. Prac. & Rem. Code

§ 37.009 because "it functions solely as a procedural mechanism for resolving substantive

'controversies which are already within the jurisdiction of the courts.'" *Utica Lloyd's of Tex.*

*v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998) (citation omitted) (affirming district court's

denial of attorney's fees under Tex. Civ. Prac. & Rem. Code § 37.009 because it is

inapplicable in federal court).

Additionally, in its response to Rabo's motion to dismiss, Lone Star suggests that it

may collect attorney's fees, presumably from Rabo, under Tex. Bus. & Com. Code §§ 9.607

and 9.608. Doc. No. 168. Under these provisions, Lone Star may not collect additional

funds from Rabo for attorney's fees. Rather, "the plain language of section 9.607(d)

provides that [a secured party] may *deduct* from its collections on the obligation its

reasonable expenses in collecting sums due from [defendant]; but neither section 9.607 nor

9.608 provides for recovery of attorney's fees *over and above* the amount of the obligation."

*CapTran/Tanglewood LLC v. Thomas N. Thurlow & Assocs.*, No. 08-2374, 2011 WL

2969835, at *3 (S.D. Tex. July 21, 2011) (citing Tex. Bus. & Com. Code §§ 9.607(d), 9.608)

(emphasis in original). As this case interpreted the statute, Lone Star would be able to pay

the fees incurred from any amount collected from Rabo if Lone Star is successful on its

claims. The amount Lone Star would actually recover would be reduced by attorney's fees, and if the recovery from Rabo is less than its attorney's fees, Lone Star would have to pay that amount to its attorneys out of pocket. This statute does not provide Lone Star with a means to increase its recovery from Rabo. *Branch Banking & Tr. Co. v. HealthGrowth Credit, LLC*, No. 1:18-783, 2019 WL 6015317, at *8 (W.D. Tex. July 23, 2019) (supporting this interpretation by *CapTran/Tanglewood LLC*).

Despite Lone Star's inability to establish a viable claim for attorney's fees by contract or state statute, it is clear from other case law that there are other ways in which a party may collect attorney's fees. Specifically, a party may recover attorney's fees as a part of damages for a successful conversion claim. Some cases support attorney's fees as a part of exemplary damages, others for actual damages, and some say neither. While the case law is conflicting as to the type of damages under which attorney's fees may be awarded, if at all, Lone Star has made a plausible claim for attorney's fees.

Lone Star's attorney's fees may be awarded as exemplary damages. Generally, attorney's fees may not be awarded for conversion claims. *Wiese v. Pro Am Servs., Inc.*, 317 S.W.3d 857, 861 (Tex. App.—Houston [14th Dist.] 2010, no pet.). But, a "trier of fact may consider attorney's fees in conversion actions when determining exemplary damages, but not when calculating actual damages." *Id.*; *R.J. Suarez Enters. Inc. v. PNYX L.P.*, 380 S.W.3d 238, 249 (Tex. App.—Dallas 2012, no pet.).[8] This exception for attorney's fees for a conversion claim is applied "where it is alleged and proven that the conversion was accompanied by willfulness, fraud, malice, oppression or gross negligence." *Hupp v. Port*

---

[8] *Compare Dorward v. Ramirez*, No. 3:09-0018, 2009 WL 2777880, at *26 (N.D. Tex. Aug. 28, 2009) (dismissing claim for attorney's fees as to a conversion claim because "[a]ttorney's fees are not recoverable as either actual or exemplary damages on a conversion claim") (quoting *Oscar M. Telfair, III, P.C. v. Bridges*, 161 S.W.3d 167, 170 (Tex. App.—2005, no pet.)).

*Brownsville Shipyard, Inc.*, 515 F. Supp. 546, 549 (S.D. Tex. 1981). Lone Star has requested that attorney's fees be considered and has alleged fraud and malice. Lone Star's claim for attorney's fees should survive Rabo's motion because it is sufficiently pleaded and constitutes a plausible claim to recover fees as exemplary damages.

In addition to exemplary damages, the Fifth Circuit has held that under Texas law, a secured party may recover attorney's fees as a part of actual damages. In *Permian Petroleum Co. v. Petroleos Mexicanos*, a case with similar facts, the court found that a secured creditor's security agreement secured "the accrued interest, costs, and attorneys' fees as well as the outstanding principal." 934 F.2d at 652. Because Texas law allows a secured party to recover the value of the secured interest in the collateral up to the value of the collateral, the Fifth Circuit reasoned that a security agreement that secured attorney's fees enabled the secured party to recover attorney's fees from another secured creditor as a part of actual damages. *Id.*; *contra Wiese*, 317 S.W.3d at 861 (jury may not consider attorney's fees in conversion actions when calculating actual damages). Lone Star, therefore, may be able to recover attorney's fees as a part of an award of actual damages if Rabo is liable for conversion.

Lone Star may request that attorney's fees be considered as a part of damages. Rabo's motion to dismiss Lone Star's cause for attorney's fees should be granted to the extent fees are sought under § 37.009 of the Texas Civil Practice and Remedies Code and § 38.001 of the Texas Business and Commerce Code. Lone Star's request for attorney's fees should otherwise survive Rabo's motion.

Respectfully submitted,

DATED: February 4, 2020

ROBERT L. JONES
U.S. BANKRUPTCY JUDGE

This Recommendation shall be entered on the docket by the Bankruptcy Clerk.

27